Good morning, Your Honor. May it please the Court, Counsel, my name is Leonard Berman and I represent the plaintiff appellant, Joseph Cunningham, in this matter. This is a case of first impression and it also poses a slippery slope as to jail policies for strip searches in the jail for deterrent effect. They are claiming that the absence of finding anything from kitchen searches done routinely on a daily basis reflects how powerful the deterrent effect is. However, this, if this case is allowed to stand, it will set a precedent that allows jails to search for inmates coming out of the dining hall, the restroom, the law library, the garden yard, anywhere where they could secrete anything that they don't have an entitlement to, they will say, well, it's a deterrent for them taking it. The kitchen is not an unsafe area. And the Supreme Court specifically said in National Treasury Employee Unions v. Von Raab, quote-unquote, this is from the opinion of our Court, page 8-9, when the government's interest lies in deterring highly hazardous conduct, a low incident of such conduct far from impugning the validity of the scheme for implementing this interest is more logically viewed as a hallmark of success. Counsel, that case was not a jail case. Okay. Von Raab. So for this particular case, we're talking about a security in a jail, which we have acknowledged is a unique set of circumstances. Sure. So what's your best case authority for the proposition that the visual search of inmates who worked in a kitchen, where admittedly there are knives and other sharp instruments and food that can be secreted and taken back to the cells and used for barter, what's your best case for the proposition that a search of those who work in the kitchen violates the Constitution? Your Honor, since this is a case of first impression, we don't have a line of case law to address it. However, the case that the Court cites in its opinion, which is Nunez, is not appropriate here because it reflects inmates going out on the roadside where they could pick up knives, they could pick up drugs, syringes, perhaps razors, things that are not available in the secure confines of the kitchen in this instant case or in any jail, presumably. But wasn't part of the concern that there could be sharp instruments, there could be shivs that could be made from some of the loose metal in the kitchen or other pieces of material that the inmates could break loose from some of the equipment? I'm sorry. Isn't that one of the security concerns? Well, Your Honor, I'm sorry. I didn't understand your statement, loose mail. I didn't hear what you said. Metal. Loose metal. I'm not – the loose metal as in utensils, Your Honor? What is loose metal in the kitchen? I'm not understanding. In the utensils or on kitchen equipment. Right. You know, a corner could come off. Right. And I thought that was the concern. Right. Your Honor, but the record here from the excerpts of record, it is very clear that in this case, the county has post orders and policies that provide for inventory of a shadow box that holds utensils and to ensure that all utensils are accounted for. Can openers and knives are affixed to the kitchen tables by cables and all the – the whole crew is supervised by video, by live people and all these things. Also, if they were concerned about metal leaving there, they could have them go through a metal detector. But are they required to use the least intrusive means of detection? Your Honor, whether it's least intrusive means of detection, they have to protect the dignity on a daily basis absent exigent circumstances like an emergency for emergency safety or highly hazardous equipment. Having them line up in rows of five or ten on a daily basis to see each other naked and even to have to go into privacy stalls when there is no legitimate basis for a fear of any contraband and none has ever been found and all these so-called dangerous contraband are accounted for or chained to a table, it appears to be a spurious basis to put inmates through on a daily basis. If they find that something is missing on a special occasion, then they say, everybody, we're going to put you in a stall, we're going to search you and see if any of you have it. But that never happens. And if it did happen on one occasion, that might be warranted, but on a daily routine basis with nothing else to show for it. Counsel? What about the cornucopia of products in a kitchen that are bonanzas outside and not proper, not just necessarily weapons or kitchen utensils, but packets of food and things like that, plus the outsiders who are coming in from the outside to work in the kitchen with the inmates, create the possibility of bringing things into the prison to distribute drugs and things like that, which is very easy for one person to pass on to another. And, Your Honor, you're indicating that drugs would enter into the kitchen so that the inmate could get the drugs from the outside? Yes. Are there people who are not inmates who are in the kitchen? No, absolutely not. Just the deputies and the inmates who are assigned. There are no third parties there. But the record established that there were outsiders who were working for contractors who worked with the prisoners. Those people would be Aramark or the various food providers, vendors, contractors that would bring in food. People? People, yes, but not people as in friends or relations of inmates that have a rapport that might want to slip them a present or what have you. But there are still individuals who are coming from the outside who would have access to the prisoners and could? Right. But the prisoners are required to strip down for them to secrete food or weapons in their private areas when they are required to change outfits and change underwear before they leave the kitchen is manifestly impossible. Where are they going to keep it and what are they going to keep? They can't. They're going to put a cookie in their private area. There's nothing to hide. There's no capacity to hide anything. Drugs have been found in body cavities. Oh, absolutely. On numerous occasions. Absolutely. But there's never been any drugs found in the kitchen in decades and decades of the Multnomah County Inmate Jail operations and none has been shown. Counselor, may I ask you, does it matter whether or not the assignment to the kitchen is voluntary? Your Honor, I don't think it is voluntary. I don't think that there can be a consent to an illegal strip search under the Fourth or Eighth Amendment, whether or not it is not expressly or impliedly any consent to a strip search. If they sign a release saying you work here with the understanding that you may be strip searched on a daily basis and you secure by consent, I don't think that would be a valid document, but that would at least show knowledge and consent to it. But I don't believe you can't consent to an assault. You can't consent to a rape. But they can avoid the strip search by working in another part of the facility. Well, they are not given choices. They are assigned there and according to our client, they are also disciplined if they do not show up for assignment and if they object and they can go into segregation. There are penalties associated with it. And regardless, these would be OSHA violations and unfair work conditions for them to have to go through these demeaning group strip searches or even in the privacy panel rooms to have to do that in order to work when there is no compelling reason. There is no highly hazardous material. Excuse me. What regulation at OSHA precludes a strip search in a jail setting? Well, I believe, Your Honor, I'm going to redirect your attention to the Oregon Administrative Rules that are cited on page 33, 34 of our opening brief. And it explicitly says in that rule that skin searches, skin searches conducted by DOC staff will be of the same gender as the inmate unless there is an emergency. Except in emergencies, inmates undergoing skin searches will be removed to a private area for the search. That precludes five in ten men seeing each other strip search naked in the state and the county has shown no reason why they should be exempt from that state regulation, Your Honor. Counsel, do you distinguish between the searches conducted in a group setting before the privacy panels were put in place or do you think the analysis is the same? So the pre-privacy panel searches versus the post-privacy panel searches. Thank you, Your Honor. I believe that there is definitely a distinction to be made that there is a lesser intrusion post-privacy panels than when they are seeing each other and on deputies and cameras are seeing them en masse, five, ten men. However, it is our contention that there is still no reasonable suspicion, probable cause, or nexus requiring them to have to go through that lesser intrusion, but still invasion of privacy to be viewed by a deputy naked every day. But there isn't any case law saying that reasonable suspicion or probable cause or anything even close to that is required when you're talking about strip searches in a prison setting. Right, but there should be a rational basis. Even this Court has said deterrence is an adequate goal. So long as the government has a justification to deter the secretion of contraband, including seemingly innocuous items like food from the kitchen, that seems to be a justification that's accepted by the Supreme Court. Correct. Then why isn't there strip searches coming out of the dining hall where they can take out fruit and beverages and sugar and make pruno on a daily basis because that is a very unfettered access to food there and every inmate could then be required to go through a strip search or a mass strip search because there's a chance that they are secreting and taking to their cell food. So you're arguing for more strip searches, that more strip searches would be the answer? Well, I'm arguing that if this circumstance were allowed to stand in the kitchen, then these would encourage other facilities to say, well, now we have carte blanche to do anywhere. There's unfettered access to food in the dining hall by the general inmate population as well? Well, of course they are served food on their plate and they can secrete it. They're served food, right? Yes, correct. They're limited in the quantity they're given. Right. That's very different than working in the kitchen and having unfettered access. Yeah, but they have a plate and they can eat a quarter of it and take half of it home to their room with them. No one dictates what portion they eat and what they take. Is that in the record? Is that in the record? Is it in the record that inmates are allowed to take their food back to the cell with them? Is that in the record? No, it's not in the record and it's not false. Well, maybe we should, I don't know if that's correct on this record, that inmates can take their food back to their... They have access to food three times a day and it is not unlike having access to food in the kitchen and they are not strip searched when they leave the dining hall to check that they are not secreting any food. That's different than saying they're allowed to take their food with them. I never, if I misspoke, if I said they were allowed to take it to their cells, they're not supposed to take it to their cells. That doesn't mean it doesn't happen or that they don't find it. But that also means that it doesn't happen that kitchen workers take it and they just haven't been discovered yet. Well, once again, there is nothing in the record to suggest a single incident of any contraband from the kitchen searches and as I said, Your Honor, the deterrence effect is a very, under these circumstances, there is no probability of any dangerous weapons, all the equipment, knives and what have you, everything is accounted for, chained up and it is very, very, very dangerous. I would like to reserve at least a minute for rebuttal, Your Honor. All right, thank you, counsel. You have a minute, 51 seconds. Good morning, Your Honors, and may it please the Court. Jackie Kamens on behalf of Multnomah County. The appellant in this case is asking this Court to revisit a decade of law from the en banc Ninth Circuit and the United States Supreme Court and essentially reinsert a reasonable suspicion requirement to jail strip searches. This Court should decline that invitation and affirm the District Court. This Court has already upheld an almost identical policy in the Nunez case. In that case, the Bureau of Prisons authorized visual body cavity strip searches, same as this case, for any time that there was a reasonable suspicion of contraband or, like here, where there was an opportunity to have contraband. Contrary to what appellant's counsel argues, it was not an outside work crew in that case. It was the policy, it was the blanket policy itself, authorizing strip searches in the event that there is opportunity to obtain contraband. In this case, there was such an opportunity. Working in the kitchen, it's 20,000 square feet. There's one deputy to supervise 20 inmates. The inmates interact with civilian workers from Aramark who, as, you know, facility workers, are in and out every day and could potentially develop relationships with the inmates, could make arrangements to smuggle items in. There is evidence in the record, in the Declaration of Brandon White, and that's found at the supplemental excerpts of Record 18, that there is a prior history of concern that the Aramark workers were, in fact, smuggling contraband in and making such arrangements with inmates. There is also access to food items, plastic wrap, shards of metal. The inmates have access to a loading dock where they are able to go outside. In that loading dock, there are pallets and large containers of large boxes, bringing shipments in, bringing shipments out, and the inmates are able to go out to that celly port and engage in that behavior, and there's pictures of that area in the record. What about the manner of the group searches in this case? And I'm referring specifically to the time period before the privacy panels were put in place because that's something that we looked at to determine the reasonableness, the scope of the search as well. This was a highly intrusive search and it was done in group settings, as I understand it, where inmates are lined up in front of each other in a... How large was the group? It was between five and ten inmates initially, and then once the privacy panels were installed, it was five inmates. Is there something in the record that justifies that sort of group search? It's difficult to answer that question the way that it's phrased. You're absolutely correct that the manner of the search... It appears from the record that nobody had complained and it is the most efficient way to conduct the search. It is more efficient than the privacy panels. Well, I thought the record was that it was for security of the deputies that you could have a larger number of deputies on site if you did it with a larger group of inmates. If you did it singly, you have to have one deputy per inmate and there was not enough staff to do that. Yes, you're absolutely correct. I'm saying the same thing in a different way, because you could search more inmates at a time before the privacy panels. You were able to have two deputies in and the searches could proceed more quickly. So you're correct. It's for the safety of the officers and also for the administrative efficiency of searching more inmates at a time. Now, in response to... Can you explain that to me? So before the privacy panels were put in place, there were five to ten inmates with two deputies in the room, right? Correct. And post-privacy panel, there were how many inmates with one deputy in the room being searched? Five inmates, Your Honor. Five inmates with one deputy and then the rest of the inmates were waiting in the salad port. Correct, Your Honor. With no deputies. No, with the other deputies, I believe. I'd have to confirm that with the record. But I believe that because the volume of inmates was smaller in the search room versus outside the search room, the majority of supervision needed to take place. So the two deputies basically split up with one waiting in the salad port with inmates and the other basically searching five at a time. This is post-privacy panel? I believe that's correct. But before the privacy panels were put in place, were there inmates also held in the salad port without deputies? There was a camera, right? Your Honor, I apologize. I'd have to check the record to answer that question. Because part of the defendant's response in this case is there was a resource issue, but the record isn't clear on how that resource issue played out. It didn't seem like there was any savings in terms of resource or time. Well, if I could take just a step back. And I think the line of questioning kind of assumes a premise that the privacy panels are required by the United States Constitution and this Court's precedent doesn't hold that they are. I'm not assuming that. I'm looking for the justification for the degree of intrusiveness of the search. It's balancing, right? You've got a security concern that's legitimate, in my view. You've got a valid justification. You've got the jail setting. But the selection, the method that's chosen is a very highly intrusive message, which undercuts the reasonable search. I'm trying to balance the concern. I'm trying to test your argument that there was a resource or safety concern here. And I think you're exactly right that that's the analysis this Court engages in. The response I would have is twofold. First, this Court has repeatedly upheld the use of group searches. Now, this is not in front of officers of the opposite gender. This is not in public view. This is in a small group of inmates who live in a dorm setting already being searched. Now, this Court has upheld that in the Mitchenfelder case, Thompson v. Souza. The United States Supreme Court considered that. In Bell, there was language in the dissent indicating that Bell v. Wolfish, the precedential case in this matter, involved a group strip search. And Florence, also there was indication from the petitioner's brief that that was a group strip search. So absent indication that that poses a constitutional problem, the county was not in the position to evaluate whether there was a means to avoid a constitutional problem because there wasn't one. The second point that I'd make is that a visual body cavity search, while undoubtedly intrusive, has been repeatedly recognized as one of the lesser intrusive ways to search an inmate. When you have to get that job done, this is the way that the courts have recognized as the least intrusive. It's non-tactile. The court in Bull recognized it, in Mitchenfelder, United States v. Falks, Nunez, Thompson, all of those cases involved visual body cavity searches and the intrusiveness factor in the court's analysis cut in favor of the county's policy. And one more point regarding the group searches. In Bull, this court considered a group search as well and determined that that factor actually, or actually it was Bird v. Maricopa County, I apologize, that that factor actually cut in favor of the reasonableness of the search because there was less opportunity for something to go wrong, for somebody to exceed the bounds of the search requirements because there were watching eyes. So it's not a clear cut. We needed to make this different in order to have it comport with the Constitution. Is there a particular reason why, after the privacy panels were installed, the deputies have to split up? And you can, I'll double check the record as well, and you should also, but as I understand it, pre-privacy panel, there was a group of inmates waiting in the sally port monitored by a video feed. There was no deputy there, but yet after the privacy panels were installed and the deputies split up, was it a space constraint or another reason that I'm not finding in the record? So on supplemental excerpts of record, page 112, it gives a little bit of explanation as to the change, and that's in the declaration of Raymond Adger's. Before the installation of privacy panels, inmates would generally be moved in groups of five to ten, with the other inmates remaining in the sally port, monitored by a control room deputy on a video screen. After the installation of the panels, only five inmates are moved at a time into the boot room, with the remaining escort deputy waiting with the rest of the kitchen crew. And my assumption from that is simply that more than a few inmates, 15 inmates, need to be monitored by a deputy. It's not sufficient to have somebody monitoring them remotely via video screen, because the risks posed by 15 inmates are substantially greater than the risks posed by a smaller number, such as five or ten. I think it's important to note that the en banc decision in this court that I think provides the most guidance, Bull v. City and County of San Francisco, involved an identical search, a visual body cavity search, and this court essentially overruled the prior history of using reasonable suspicion as a requirement. And that analysis was confirmed by the United States Supreme Court in the Florence case. So contrary to appellant's counsel argument, this isn't an issue of first impression at all. There is a long history of analysis in this area. There's many cases analyzing the constitutionality of strip searches, and the balancing test from Bell has been well established that if there is a general need to search an inmate, as there is in this case given the risks posed by the large kitchen area with all of the items, such as plastic wrap and metal that can't be detected through a pat-down or metal detector. You would agree there are factual questions as to the inventorying of the kitchen utensils, but you're saying that it's not a material fact because you're assuming the other side's facts and saying it doesn't matter. I think that there is not actually a factual dispute there. We both agree that there is a shadow box to inventory the large knives. The can openers are in fact chained to the table, but there is no inventory of food. There is no inventory of plastic wrap. There is no inventory of scraps of wood, shards of metal. There's no inventory of all the utensils, forks, knives. I think there's agreement there. And I think there's also agreement as to the... Appellant argues in their brief that there is a dispute of fact over the level of supervision of the inmates in the kitchen, and there is not in fact a dispute of fact there. There is one deputy supervising 20 inmates. Did you say no inventory of forks and knives? Correct. I believe that's correct. So the asserted dispute of fact is that there's one deputy supervising 20 inmates, and that's correct. We both agree that there's one deputy in a 20,000-square-foot area with a loading dock supervising 20 inmates. I think the implication is... Appellant asserts that as constant supervision, and what the county would assert is that that creates a lot of opportunity for inmates to smuggle in contraband that could potentially be used to create weapons, to barter with other inmates, to create a general risk to the safety of the officers and the inmates in the jail. Counsel, do you agree with opposing counsel's position that working in the kitchen is an assignment rather than a voluntary endeavor? It can be... It's a volunteer if you are a pretrial detainee in the jail, and it is not a volunteer assignment if you are a sentenced inmate. So there's no way that an inmate can opt out of working in the kitchen? A sentenced inmate, that's correct. That's correct. Although I think the district court's analysis on that is persuasive. The district court compared that to the doctrine of police-created exigency and found that because there's no constitutional violation in requiring a work assignment in the first place, there's no constitutional violation in the attendant search requirements that may result from that because many prison work assignments may involve heightened security restrictions, and because the work assignment itself doesn't violate the Fourth or Eighth Amendments, then neither does the required search. If the Court has no further questions, I would ask that you affirm the district court. All right. Thank you, Counsel. Rebuttal? Thank you, Your Honor. I think the Court is on to the right track here. The manner of the strip search, their explanation is no one complained before, so we didn't comply with the Constitution. There's no case law to suggest that inmates or any citizen has to complain before a facility is being compliant with the Constitution, and the Court is right that they cannot opt out if they are sentenced, and there is also a case law. In the record, it is very clear that all kitchen workers are supervised during the entirety of the serving kitchen duty, and before the kitchen workers endure the strip searches, the MCIJ staff account for all utensils and equipment following each shift. They could also account for all food and all wrapping. If they are so concerned with their closed-circuit video and with their staff, they could have close monitoring and say, hey, hey, hey, take a look at the video. Inmate X looks like he did something furtive, and then take Inmate X and have him searched, or a bunch of them. But there is no evidence that they have that heightened concern for that heightened view of them. This is not inmates that are coming out, future inmates coming from the outside community which could bring in drugs or contraband or weapons. This is within their own facility under their own control. And furthermore, any cost issues or feasibility or convenience, administrative inconvenience experienced to comply with the Constitution conducting individual strip searches is an inadequate justification for unlawful practices under Frontiero v. Richardson, 411 U.S. 677 at 690, 1973. And although efficacious, administration of government programs is not without some importance. The Constitution recognizes higher values than speed and efficiency, Your Honor. Thank you, counsel. Thank you. Thank you to both counsel for your helpful arguments in this case. The case just argued is submitted for decision by the court.
judges: Rawlinson, Nguyen, Garbis